# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 19, 2015 Session

## SHAUN ALEXANDER HODGE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 100532    Mary Beth Leibowitz, Judge**

---

**No. E2014-01005-CCA-R3-ECN-FILED-JULY 8, 2015**

---

A Knox County Criminal Court Jury convicted the petitioner, Shaun Alexander Hodge, of first degree premeditated murder, and the trial court imposed a life sentence. Subsequently, the petitioner filed a petition for a writ of error coram nobis, arguing that he was entitled to a new trial based upon the recantation of a State witness. After an evidentiary hearing, the coram nobis court denied the petition, and the petitioner appeals. Based upon our review of the oral arguments, the record, and the parties' briefs, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Abby Satterfield and Sam Short, University of Tennessee Legal Clinic Student Attorneys, and Stephen Ross Johnson, Supervising Attorney, Knoxville, Tennessee, for the appellant, Shaun Alexander Hodge.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

This case relates to the shooting death of Benny Boling in April 1998. In February 2001, the petitioner was tried for the first degree premeditated murder of the victim. The facts presented at trial previously have been summarized as follows:

[T]he forensic evidence established that the victim was slain at a local housing project on April 26, 1998. The victim died after being shot five times by a nine-millimeter semiautomatic handgun. While the victim was initially shot from the rear as he occupied the cab of his pickup truck, he managed to drive himself a short distance away before running off of the road and ultimately fled on foot approximately seventy-five feet up a hill before collapsing near a day care center. There, the victim's body was discovered, with the victim still clutching a $100 bill in his hand. Police recovered a total of seventeen spent shell cartridges from the scene. During the autopsy, the victim's blood tested positive for cocaine.

The murder weapon was never recovered, and none of the forensic evidence definitively connected the petitioner to the victim's shooting. The prosecution's case hinged on the testimony of four eyewitnesses. Debra Turner, who lived in the community, testified that on the day of the shooting, she was at home when she heard someone outside threatening to kill someone if he did not buy drugs. She looked out her back door and saw the petitioner talking to the victim, who was in his truck. After she heard the victim refuse to buy the drugs, she heard a gunshot and saw the victim's truck moving away. The petitioner followed the truck, firing into it. When the truck struck a tree, the victim exited the truck and ran. The petitioner followed him, still firing at the victim. When the victim collapsed, the petitioner stood over him and shot him. Patricia Hamilton, who was visiting Debra Turner at the time of the shooting, testified to essentially the same version of events.

A third witness, Lorraine Young, who lived nearby, testified that she knew the petitioner prior to the shooting. The day prior to the shooting, she saw the victim drive into the housing projects and purchase drugs. On the day of the shooting, Ms. Young was lying in bed when she heard a commotion and looked out her bedroom window. She saw the petitioner and three men standing near the victim's truck having an argument about drugs and money. She heard the victim refuse to buy drugs. She left the window for a moment and then returned to see the victim crash his truck and flee away on foot

while the petitioner shot him.

The final eyewitness, Tim Bolden, testified that he had previously sold the victim crack cocaine and did so on several occasions the day of the shooting. At the time of the shooting, Mr. Bolden was gambling with some other men when he saw the victim drive up, looking to purchase additional drugs. However, Mr. Bolden testified that he continued to gamble and that the petitioner approached the victim's truck. Mr. Bolden testified that he heard loud voices, saw the victim leaving in his truck, and saw the petitioner firing at the victim. After the victim's truck struck a curb, the victim left the truck and fled on foot. The petitioner continued to shoot the victim and, afterward, came back down the hill while the men who were gambling fled the scene.

The defense's theory of the case was that the prosecution's four eyewitness identifications were erroneous and that one of those eyewitnesses, Mr. Tim Bolden, may have been the actual killer. The defense presented the testimony of six eyewitnesses in support of this theory. Latroy Askew, a friend of the petitioner, testified that the two rode around all night on Saturday night and that the petitioner went home before the shootings occurred on Sunday. Ms. Glenda Ward, who lived in a complex near the crime scene, testified that she looked out her window one day and saw one man chasing another man up a hill before shooting him. She testified that the shooter was not the petitioner. Reginald Woodruff, a childhood friend of the petitioner, testified that the petitioner came to his house the morning of the shooting and stayed with him, his son, and another man while they were playing video games. Pierre Jarrett, who was playing basketball nearby at the time of the shooting, testified that he heard shots, saw a truck move up a hill before coming to a stop, and saw a man who was not the petitioner standing nearby with a gun. Paul Chandler, a retired army officer who was collecting cans in the area when the shooting occurred, testified that he saw the murder and that the petitioner was not the shooter. Malik Hardin, the petitioner's cousin, testified that he was with the petitioner at the time of the shooting and that Mr. Tim Bolden had, in fact, shot the victim

while the petitioner was gambling with others nearby. In addition to these eyewitnesses, the defense presented the testimony of two witnesses who testified that Debra Turner had made statements to them to the effect that she intended to falsely implicate the petitioner in the victim's murder in order to retaliate against the petitioner for beating and hospitalizing her son.

Shaun Alexander Hodge v. State, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *1-2 (Tenn. Crim. App. at Knoxville, Aug. 26, 2011).

The jury convicted the petitioner as charged, and the trial court sentenced him to life. On direct appeal of his conviction to this court, the petitioner raised six issues, including that the evidence was insufficient to support the conviction and that he was prejudiced by the testimony of alleged mental patient Lorraine Young. State v. Shawn Hodge, No. E2002-01794-CCA-R3-CD, 2003 WL 22888892, at *1 (Tenn. Crim. App. at Knoxville, Dec. 8, 2003). This court found the evidence sufficient. Id. at *11. As to Young, this court stated, "The record in this case contains no reference to, mention of, or corresponding objection about Lorraine Young's mental status. There being no factual support for this issue, it is rejected and needs no further discussion." Id. at *14.

After our supreme court denied the petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel, who subpoenaed Young's medical records from Lakeshore Mental Health Institute and received "three full volumes of materials pertaining to Ms. Young's mental treatment at that facility." Hodge, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *3. Post-conviction counsel then filed an amended petition, claiming that trial counsel was ineffective for failing to obtain the medical records, that the petitioner's due process rights had been violated by the State's failure to turn over the allegedly exculpatory records to the defense, and that the records constituted newly discovered evidence of the petitioner's innocence. Id. This court denied the petition for post-conviction relief, stating as follows:

> There appears to be no reason in the record for trial counsel to have suspected that Ms. Young suffered from mental health problems. Although the petitioner had known Ms. Young for a period of many years, it does not appear from the record that the petitioner raised the issue of Ms. Young's mental health issues with his trial counsel. Without something in the record to indicate that his trial counsel was placed on notice that Ms. Young suffered from any significant mental health problems, we

-4-

do not believe that trial counsel fell below an objective standard of reasonableness in failing to investigate this issue further. Trial counsel's performance here has not been shown to be deficient.

Id. at *5.

On November 5, 2012, the petitioner filed a petition for a writ of error coram nobis, alleging newly discovered evidence in that Patricia Hamilton recanted her testimony in April 2012. The petitioner acknowledged that he filed the petition outside the one-year statute of limitations but argued that, because Hamilton did not recant her testimony until 2012, due process required tolling the statute of limitations. In support of the petition, the petitioner attached Hamilton's sworn affidavit in which she stated that on the day of the shooting, she heard gunshots and that Debra Turner said the shooter was the petitioner. Hamilton stated that she went to the window, that she saw a person running toward the victim, that the person was wearing a dark hoodie, and that "[w]ith regard to my statements at trial, my statements were based on [Turner's] account of the facts. I basically agreed with her."

At the coram nobis hearing, Hamilton testified for the petitioner that at the time of the shooting, she was visiting Debra Turner, her first cousin, at Turner's apartment. Hamilton said that Turner "went out the back door" and that Hamilton heard gunshots. When Turner came back inside, Hamilton asked who was shooting, and Turner answered, "DeShaun." Hamilton said that she did not see the shooting but saw someone running and that the person was wearing a black hoodie. She said that she did not see the petitioner "under the hoodie" and that "I was just going on what Debra said when she entered the house." She acknowledged that she "reached out" to counsel and signed the affidavit.

On cross-examination, Hamilton testified that she changed her story about the petitioner being the shooter after another first cousin, Marvin Turner, contacted her. She said that Mr. Turner "practically raised" the petitioner but denied that Mr. Turner influenced her to change her testimony. She said that "I had already talked about it with Debra before I ever talked to my other cousin, Marvin." She stated that "the real situation" involved the petitioner and one of Debra Turner's sons prior to the shooting and that "I'm, you know, just here to really tell the truth like it really happened."

Hamilton testified that in 1998, she was in a car accident and spent time in a trauma unit in Mobile, Alabama. She said that "I forget a lot of things now" but that any memory problems were due to her "gettin' old," not the car accident. She acknowledged that at the petitioner's trial, she stated that she saw the victim get out of the truck and run up the hill. She also acknowledged testifying, "'I saw Little Shaun; he was right behind [the victim] just, you know, shootin' him." She said that she was not lying at trial but that she was telling the

truth "based on what Debra said." She said she did not remember testifying at trial that the shooter had the hood on his head as he chased the victim up the hill or that the shooter took off the hood after the shooting. The following exchange then occurred:

Q   Okay. Well, do you remember **seeing** that?

A   No, I don't remember seeing the hoodie off the head.

. . . .

Q   I'm trying to figure out what you testified falsely about. Is this part of it?

A   No, I just--I don't remember.

Q   Well, are you telling the Court then that it's possible that you did see, uh, the person come back down the hill and take the hood off his--his head? Is it possible that that-- what you said there is true?

A   It's possible.

Q   Okay.

A   But I can't remember.

Q   And then you were asked, "Who was it? When you could see his face, who was it?" And your response was, "Well, I know him as little Shaun." Is that true or did you commit perjury when you said that?

A   I--I don't remember. I see it. I--but I don't remember.

Q   Okay.

A   I don't remember saying that, you know.

Q   Okay. Well --

A   It's there so I said it, but I--I've forgotten a lot of stuff.

-6-

I don't remember.

Q Okay. Well, uh, so you're not sure if when you said that
you were telling the truth or not?

A I remember but I--I--I forgot.

The State read Hamilton's trial testimony to her, line by line, and she acknowledged that most of it was true.

On redirect examination, Hamilton testified that she did not think the petitioner was the man wearing the hoodie and that her identification of him was "based on his name bein' called." Hamilton said that she and Debra Turner continued to have a close relationship, that they still talked about the shooting, and that "I still just want her to tell the truth, but it's still based on her sons." Hamilton stated, "I saw the shooting; I just don't know who was doing the shooting."

On recross-examination, Hamilton testified that she had heard a lot about the case over the years. She acknowledged that she thought the petitioner had spent enough time in prison.

At the conclusion of Hamilton's testimony, counsel for the petitioner argued that her recanted testimony constituted newly discovered evidence and that, in considering whether her testimony warranted coram nobis relief, the court should consider the entire record, including the evidence discovered by post-conviction counsel regarding Young's mental illness. The State argued that the petition for a writ of error coram nobis was time-barred and that, regardless, Hamilton's testimony did not constitute newly discovered evidence.

In a written order, the coram nobis court first addressed the timeliness of the petition and concluded that although the petitioner filed his petition well-outside the one-year statute of limitations, the statute should be tolled because he filed his petition just seven months after Hamilton signed the affidavit recanting her testimony. The court then addressed whether coram nobis relief was warranted based upon Hamilton's recantation. The trial court noted that Hamilton's evidentiary hearing testimony was inconsistent with her trial testimony. The court said that it did not think Hamilton "was purposefully trying to be inconsistent" but concluded that "her recollection of events has faded and/or changed over time and has been affected by talking with others about the events in question and her sympathies toward everyone involved." The court said that it was "not reasonably well satisfied that the prior testimony was false" and that it "need not reach the issue of whether the 'new evidence' may have resulted in a different judgment had it been presented at trial." The court denied the

petition.

## II.  Analysis

The petitioner contends that he is entitled to a new trial based upon Hamilton's recanted testimony and that the coram nois court was required to evaluate the newly discovered evidence in light of the entire record, which also consisted of Young's psychiatric records.  The State concedes that pursuant to Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992), the coram nobis court properly tolled the statute of limitations.  However, the State argues that the court did not abuse its discretion when it denied coram nobis relief.  We agree with the State.

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105, which provides as follows:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith. . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court.  See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee.  See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007).  The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall."  State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered

evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

The petitioner's petition for coram nobis relief is based on a claim of recanted testimony. Recanted testimony may be considered newly discovered evidence under certain circumstances. See Mixon, 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing Mixon, 983 S.W.2d at 673 n.17).

Here, the coram nobis court was not reasonably well satisfied that Hamilton's trial testimony was false and that her new testimony was true. The court said that it did not think Hamilton was being intentionally dishonest at the coram nobis hearing but concluded that "her recollection of events has faded and/or changed over time and has been affected by talking with others about the events in question and her sympathies toward everyone involved." At the hearing, Hamilton acknowledged that she had trouble remembering the shooting; that she had talked with others, namely Debra and Marvin Turner, about the event; and that she was sympathetic to the petitioner's being in prison. Moreover, when the State

cross-examined her about her trial testimony, she acknowledged that she could not remember much of her testimony and that it was possible she saw the shooter take the hood off his head as she had testified. We note that in her affidavit and during her direct testimony at the hearing, Hamilton stated that she did not see the shooting. However, on redirect examination, she stated, "I saw the shooting; I just don't know who was doing the shooting." The coram nobis court was able to see and hear Hamilton's testimony at the trial and the evidentiary hearing and was in the best position to judge her credibility. "[A]ppellate courts do not reassess credibility determinations." Dellinger v State, 279 S.W.3d 282, 292 (Tenn. 2009). In our view, the coram nobis court based its conclusion on a reasonable assessment of the evidence, and the petitioner is not entitled to relief.

As to the petitioner's claim that the coram nobis court was required to consider Young's mental health records, consideration of such additional evidence only comes into play when the coram nobis court is considering whether the jury might have reached a different conclusion had the truth been told. See Johnson v. State, 370 S.W.3d 694, 701 (Tenn. Crim. App. 2011). Given that the coram nobis court was not reasonably well satisfied that Hamilton's prior testimony was false, it did not need to consider, in light of the entire record, whether Hamilton's new testimony might have caused the jury to reach a different result. In any event, we note that neither Young nor a mental health expert testified at the post-conviction or coram nobis hearings as to how her mental health affected her trial testimony and that the petitioner has not explained how Young's condition affected her testimony. Therefore, nothing indicates that such evidence would have affected the coram nobis court's decision whether to grant relief.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the coram nobis court.

_____
NORMA MCGEE OGLE, JUDGE