IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 20, 2017 Session

**MARLON DUANE KISER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 295051   Don W. Poole, Judge**

_____

**No. E2016-02359-CCA-R3-ECN**
_____

The Petitioner, Marlon Duane Kiser, filed in the Hamilton County Criminal Court a petition for a writ of error coram nobis, seeking relief from his conviction of first degree murder and resulting sentence of death. In the petition, he alleged that newly discovered evidence and recanted testimony established that someone else committed the murder. The coram nobis court denied the petition. On appeal, the Petitioner challenges the court's ruling. Upon review, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Paul Bruno, Nashville, Tennessee, and Luke A. Evans, Murfreesboro, Tennessee, for the Appellant, Marlon Duane Kiser.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; and M. Neal Pinkston, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, our supreme court summarized the proof adduced at the Petitioner's trial as follows:

> In the early morning hours of September 6, 2001,
> Deputy Sheriff Donald Kenneth Bond, Jr., of the Hamilton
> County Sheriff's Department was shot to death while on duty

patrolling the East Brainerd area of Chattanooga. In October 2001, a Hamilton County grand jury indicted [the Petitioner] for first degree premeditated murder, first degree felony murder in the perpetration of theft, and first degree felony murder in the perpetration of arson. . . . At trial, the State sought to prove that [the Petitioner] hated the police and, when confronted by an officer while trying to commit another crime, murdered him. The defense sought to show that [the Petitioner] was framed in the murder by his friend and housemate, James Michael Chattin.

. . . .

The State's proof showed that, in November 2000, Uncle Charlie's Produce, a fruit stand owned by Charles Sims on Brainerd Road about a mile from Chattin's house, burned down under suspicious circumstances. Several weeks before Bond's murder, [the Petitioner] and his friends Mike Chattin and Carl Hankins stopped by Sims' rebuilt fruit stand. [The Petitioner] remained in Chattin's truck while Chattin and Hankins spoke with Sims, who told them he suspected that a competitor, the owner of Nunley's fruit stand across the street, had burned down his old stand. When Chattin and Hankins returned to the truck and informed [the Petitioner] of Sims' suspicions, [the Petitioner] remarked, "we ort [sic] to go up there and kick his [Nunley's] produce around a little bit and turn his tables over and maybe drag him up and down the road." Later that day, [the Petitioner] suggested burning Nunley's fruit stand because [the Petitioner] thought "an eye for an eye" should apply. According to the State's theory, this encounter caused [the Petitioner] to begin planning the arson of the fruit stand.

[The Petitioner] had lived with Chattin at Chattin's house on Brainerd Road in Chattanooga until he moved to his girlfriend's house on Gann Road in Hamilton County about six weeks before Bond's murder. On the afternoon of September 5, 2001, after receiving a telephone call from Chattin, [the Petitioner] left his girlfriend's house with his MAK-90 semiautomatic assault rifle and a backpack. That evening [the Petitioner], Hankins, and Murphy Cantrelle, another of Chattin's friends, were at Chattin's house.

Cantrelle and Hankins left at about 10 to 11 p.m., near the time that Chattin and his girlfriend, Carol Bishop, arrived. Before Hankins departed, [the Petitioner] told him that it was time for him to leave, "that there was either things going on or things [Hankins] didn't need to be a part of, that it would be better off if [Hankins] just left." When Chattin and Bishop went to bed around 11:30 p.m., [the Petitioner] was still at Chattin's house.

Around 1:30 a.m. on September 6, 2001, Nola Rannigan, who lived in the house next to Nunley's produce stand, noticed a car in the parking lot with its lights on. She later heard "a big bam and then . . . several bams after that and then a couple pops." Rannigan looked out the window and saw that the car was still there. About five or seven minutes later she saw a truck with its lights off pull out of the parking lot and slowly proceed west on Brainerd Road. Rannigan saw only one person, the driver, in the truck. When the driver straightened himself up, she could tell that he was "a fairly big man, at least six f[ee]t."

That same morning Deputy Bond was patrolling the East Brainerd Road area in his marked patrol car. When he did not respond to calls from the dispatcher, officers began looking for him. At about 2:30 a.m., Officer Kevin Floyd of the Hamilton County Sheriff's Department found Deputy Bond's body lying in the parking lot at Nunley's fruit stand. Deputy Bond had suffered multiple severe gunshot wounds, seven inflicted with a high-powered large caliber weapon. Two other wounds were consistent with a .40 caliber Glock pistol. The wounds were spread over the victim's body from his mouth and neck to his arms, abdomen, thigh, and knee. The gunshot wound in the victim's mouth occurred while the victim's mouth was partially open, rupturing the victim's lips, and exited the base of the victim's skull. Bond's shirt was open, and the front part of his bulletproof vest and his .40 caliber Glock service weapon were missing. There was no blood on the front of Deputy Bond's shirt in the area where his bulletproof vest would have been, but blood was present on the back panel of the vest. Bond's patrol car was still on the lot, running and with its lights on. Another vehicle, a black Ford truck, was also parked at Nunley's. Investigating

officers noticed the odor of kerosene or gasoline around the produce stand and a greasy film on the Ford's windshield, its hood, the truck's passenger side, and the nearby ground. Analysis of a soil sample taken from underneath the passenger door of the truck revealed the presence of gasoline. Prints from a size 13 shoe were discovered behind the truck. Investigators also found shell casings, cartridge casings, and bullets on the ground at the fruit stand.

Around 4 a.m. Mike Chattin approached a Chattanooga police officer at a convenience store and told him, "My buddy just killed a policeman." Chattin was "extremely upset, shaking all over, [and] trembling." Based on Chattin's information about [the Petitioner], a SWAT team was sent to Chattin's house around 5 o'clock that morning. SWAT team members took positions from which they could observe the back of the house. At least three team members saw [the Petitioner] walk out of the house onto the deck and drop several objects off of the deck. About ten or twenty minutes later [the Petitioner] came out of the basement and approached his car, where SWAT team members apprehended him. When the officers attempted to handcuff him, [the Petitioner] tried to grab an officer's gun, and a fight broke out between [the Petitioner] and SWAT team members. [The Petitioner] was eventually subdued and taken to the hospital for treatment of injuries suffered during his arrest.

A search of the area below the deck, where the SWAT team members had seen [the Petitioner] throw the objects, yielded the front half of Deputy Bond's bulletproof vest and his .40 caliber Glock pistol as well as black sweat pants, a black hooded sweatshirt with a camouflage cape attached by fishing line, a black T-shirt, and a size 13 boot. Inside the open doorway to the basement, officers found [the Petitioner's] MAK-90 rifle with two magazines. The gun was ready to fire. In the basement the officers also recovered a backpack and other items, including a cellphone. In the backpack they found a spool of fishing line, another magazine of ammunition, and boxes of Wolf ammunition. A bullet hole was discovered on the passenger's side of Chattin's Dodge truck, which was parked at the house. A substance appearing

to be blood was observed on the exterior passenger side, the windshield, and the hood of the vehicle.

Forensic testing revealed that nine of the shell casings found at Nunley's stand and bullet fragments recovered from the victim's body had been fired from [the Petitioner's] gun. Other casings found at Nunley's stand had come from the victim's gun. Gunshot residue was found on [the Petitioner's] hands in an amount sufficient to conclude that he had shot a gun. Particles on the sweat pants and sweatshirt found near the deck were consistent with gunshot primer residue. The partial shoe tracks near the Ford truck at the scene were consistent in size, shape and tread design with the sole of the left boot discovered under the deck. Microscopic examination of fibers obtained by vacuuming the victim's patrol car and fibers from the burlap sewn onto the sweatshirt showed that the two were consistent with one another. Fibers microscopically similar to fibers from the sweat pants and T-shirt were found on the interior driver's side of the victim's car. Hairs on the T-shirt, sweat pants and sweatshirt were microscopically similar to [the Petitioner's] hair; and [the Petitioner's] DNA was found in the waist band of the sweat pants. Gasoline was also present on the clothing. DNA testing established that the blood on Chattin's truck belonged to the victim, Donald Bond.

Mike Chattin testified that [the Petitioner] knocked on the door of the bedroom where Chattin and Carol Bishop were sleeping at about 2:30 a.m. and asked to speak with Chattin privately. Chattin followed [the Petitioner] to a second bedroom, where [the Petitioner] told him that he had borrowed Chattin's Dodge Ram truck and pointed to the bed where Deputy Bond's service weapon, the front of Bond's bulletproof vest, and [the Petitioner's] assault rifle were lying. [The Petitioner] then announced that he had killed a policeman. [The Petitioner] said that he regretted leaving shell casings and not getting an entire bulletproof vest but that the killing had provided him "stress relief." He told Chattin that he had killed fifteen to seventeen other people, two or three of whom were policemen. When the two men heard an ambulance pass by, [the Petitioner] chuckled and said, "[i]t ain't going to do them no good, they're too late." [The

Petitioner] told Chattin he had gone to Nunley's to burn it. When he saw Deputy Bond pull into the parking lot, he crouched behind the truck. When Bond approached, he came out from behind the truck and shot Bond. [The Petitioner] told Chattin that he picked up Deputy Bond and tried to pull off the vest, which came apart and caused Bond's head to hit the ground. According to Chattin, [the Petitioner] had "liked it so much that [he] picked him up and did it again." [The Petitioner] offered to give Deputy Bond's gun to Chattin and expressed the need to "get rid of that stuff" but refused Chattin's offer to help him do so.

After going outside to talk with Chattin's neighbor, Pam Treadway, about the police cars rushing to Nunley's produce stand, [the Petitioner] asked Chattin to take him back to the crime scene. Chattin refused. [The Petitioner] related to Chattin that when Chattin's truck had not started after he shot Bond, he tried to drive away in Bond's patrol car but could not get it into gear. Finally, he started Chattin's truck and drove away. [The Petitioner] presented Chattin some tomatoes he had brought from Nunley's as a "present." [The Petitioner] said that he would need food and protection and that Charlie Sims should know about what had happened. Chattin explained that [the Petitioner] was not excited while telling him about the murder but "was very calm, [and] showed great pleasure."

After hearing [the Petitioner's] story, Chattin returned to his bedroom, woke up Bishop, and told her what [the Petitioner] had told him. Implementing a plan the two worked out to elude [the Petitioner] and escape the house, Chattin told [the Petitioner] that he was leaving in his own car to eat breakfast with Bishop who left first in her car around 3:30 a.m. and headed to her own home. Chattin stopped to get gasoline, unsuccessfully tried to contact a friend of his who was a policeman, and stopped again for gas. After checking to see that Bishop was safely at home and trying once again to reach his friend, Chattin called 911, then waited at the convenience store where he encountered the police officer at 4 a.m. Chattin testified that he did not kill Deputy Bond.

The parties stipulated that [the Petitioner] had filed a civil rights lawsuit in federal district court in Chattanooga in 1999 seeking monetary damages from three Chattanooga police officers and the City of Chattanooga. This case was set for trial in mid-September 2001. The State presented proof that Malcolm Headley, a friend of [the Petitioner], sold [the Petitioner] the MAK-90 assault rifle used to kill the victim. [The Petitioner] also asked Headley to sell him a bulletproof vest. Headley refused but told [the Petitioner] where he could purchase one. [The Petitioner] told Headley that he had had "trouble with some law officers" and "had a lawyer working on it." [The Petitioner] said that he was "going to take care of this problem." When Headley asked if [the Petitioner] was going to court, [the Petitioner] replied, "Well, yeah, and if I could kill somebody, I will, even if I have to sneak up on them and do it." When Headley gave [the Petitioner] a "funny" look, [the Petitioner] said that he was joking. Carl Hankins testified that [the Petitioner] told him when they were talking about the police that [the Petitioner] "very much disliked the police department." [The Petitioner] also told Hankins that if a police officer tried to take him into custody, [the Petitioner] "would kill a man before he would ever take a beating like he took before."

The defense theory at trial was that Chattin was the real killer and had framed [the Petitioner]. The proof showed that Chattin owned several guns and that ammunition of the type used in the MAK-90 was found in his house. Chattin also was involved in buying drugs and using methamphetamine. After the murder he had warned persons to whom he had given or sold guns not to let the police know where the weapons had come from. Chattin's wife, Tina Hunt, left him in the spring of 2001 because of physical abuse and his drug use. Sheriff's officers thereafter served a restraining order on Chattin and left a warning at his house when he violated the order by stalking his wife at her work. The defense presented testimony that Chattin thought his wife was dating a policeman and that the police were harassing him. The wife of one of Chattin's drug dealer friends testified that the weekend before September 6, Chattin told her that he wanted to kill somebody or burn something. The defense presented inconsistencies in Chattin's accounts of the

circumstances surrounding [the Petitioner's] telling him about the killing and Chattin's "escape" from the house afterward. Another of Chattin's acquaintances testified that [the Petitioner] had answered the telephone at 1:30 a.m. on the night of the murder when the witness called Chattin's house.

Pam Treadway, Chattin's neighbor, testified that in May 2001, Chattin had asked her to lie to a sheriff's officer who had come to his house looking for him and tell the officer that he was not at home. Later that night Chattin came to Treadway's house, laid some papers and a .9 mm gun on her coffee table, and told her not to touch the gun, that he was going to "kill him a cop." Chattin left the gun with Treadway. Treadway also testified that on the night of the killing she looked through her window and saw [the Petitioner] sleeping on the couch in Chattin's living room. Treadway said that she saw Chattin and Bishop leave Chattin's house around midnight September 6 and come back at 12:30 a.m. Chattin then followed Bishop in his car as she drove away in her car. Around 1:30 a.m. she saw Cantrelle leave in Chattin's truck. About 2 a.m. Treadway observed Cantrelle packing garbage bags and "stuff" behind the seat of a Chevette and then drive away. Later that night, as she and [the Petitioner] were watching police cars respond to the murder, [the Petitioner], who was dressed in shorts and a top, acted like someone who had just woken up. After the murder, Treadway said, Chattin told her to keep her mouth shut or he would shut it for her; he also threatened to set fire to her house and unscrewed the bulbs out of her security lights.

The defense also presented the testimony of Dr. Marilyn Miller, a professor of forensic science and crime scene investigation. Dr. Miller testified in detail about the shortcomings in the criminal investigation of this case, including inadequate security at the crime scene; the failure to test for fingerprints on the hood of Chattin's truck; and the "meaningless" gunshot residue tests. Dr. Miller also testified that chemical examination of the fibers found in the victim's patrol car disclosed that they had not come from the same source as the burlap fabric sown on the sweatshirt found beneath the deck at Chattin's house.

- 8 -

To raise doubt about [the Petitioner's] willingness to commit a murder on the night of September 5th, the defense called the attorney representing [the Petitioner] in his federal law suit to testify that he and [the Petitioner] had an appointment scheduled for 8:30 a.m. on September 6 to discuss a possible settlement of the case. On cross-examination of the attorney, the State introduced [the Petitioner's] July 2001 answer to an interrogatory in the case, in which he stated that he had "grown to despise the police" and felt that they were "crooked."

State v. Kiser, 284 S.W.3d 227, 234-39 (Tenn. 2009).

The jury convicted the Petitioner of first degree premeditated murder, first degree felony murder committed in the perpetration of theft, and first degree felony murder committed in the perpetration of arson. Id. at 239. The jury imposed a sentence of death on each count. Id. On appeal, our supreme court affirmed the convictions and the sentence of death but remanded to the trial court to merge the convictions into a single conviction of first degree murder. Id.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, counsel was appointed, and multiple amended post-conviction petitions were filed. Marlon Duane Kiser v. State, No. E2016-01644-CCA-R3-PD, 2017 WL 6549893, at *1 (Tenn. Crim. App. at Knoxville, Dec. 21, 2017), perm. to appeal denied, (Tenn. Apr. 19, 2018). Among numerous other claims, the Petitioner

argue[d] that Kimberly Bowman's testimony at the post-conviction hearing that Chattin admitted to her that he killed Deputy Bond qualifie[d] as newly discovered evidence requiring a new trial. Additionally, he contend[ed] that Lisa Gray's testimony at the post-conviction hearing that Chattin told her about his ex-wife's having an affair with a police officer and, when asked if he killed Deputy Bond, Chattin did not deny doing so qualifie[d] as newly discovered evidence. Likewise, the parties stipulated at the post-conviction hearing that Roberta Lynn Pardue would have testified that Chattin was abusive to her and that he admitted to shooting a police officer when he and another individual went to burn down the fruit stand.

Id. at *19. On July 13, 2016, the post-conviction court denied the petition. Id. at *1. On appeal, this court upheld the denial and noted that "claims of actual innocence not based

on newly discovered scientific evidence are not cognizable in a petition for post-conviction relief" but are more properly addressed in an error coram nobis petition. Id.

On April 23, 2015, while the post-conviction proceeding was pending, the Petitioner filed a petition for a writ of error coram nobis alleging that during the post-conviction hearing, Kimberly Annette Bowman had recanted her trial testimony and implicated Chattin in the murder of Deputy Bond.[1] He further alleged that at the post-conviction hearing, Lisa Gray's testimony and Roberta Pardue's affidavit established that Chattin made statements suggesting he committed the murder. In the petition, the Petitioner maintained that he would rely solely upon proof adduced at the post-conviction hearing to establish he was entitled to coram nobis relief. However, on June 27, 2016, the Petitioner filed an amended petition seeking an error coram nobis hearing in order to submit additional proof from a newly discovered witness, Mitchell Reynolds, who would testify that he heard Chattin threaten to kill a police officer shortly before the murder of Deputy Bond.

At the post-conviction hearing, Bowman acknowledged that she had not told the truth when she testified at the Petitioner's trial and had committed perjury. Bowman said that Chattin and Drake had threatened to kill her if she told the truth. Additionally, she was approached in a Walmart parking lot by one of Chattin's "biker friends." The man scared Bowman because he was "horrible looking, he was big and had bushy hair and a big old bushy beard . . . ." The man threatened to kill Bowman's children if she revealed any incriminating statements she heard Chattin make.

---

[1] On direct appeal, this court summarized Bowman's trial testimony as follows:

> Kimberly Bowman testified that she currently was serving a federal prison sentence for a drug conspiracy conviction. Her common-law husband, Greg Drake, and Mike Chattin were good friends. Bowman said that sometime before the murder, she overheard two conversations between Drake and Chattin. First, Chattin told Drake that his wife [Tina Hunt] was having an affair with someone she worked with at the Sonic. Chattin said he would hurt the man if he ever saw them together. Later, Chattin told Drake that if Drake "ever got busted with our drugs," he should not tell the police that Chattin had supplied Drake with some guns. Chattin also told Drake that he believed his wife was having an affair with a police officer. After the murder, Chattin told Drake "about his roommate killing a police officer." On cross-examination, Bowman testified that before Chattin and his wife separated, she never heard Chattin's wife say anything about dating a police officer.

State v. Marlon Duane Kiser, No. E2005-02406-CCA-R3-DD, 2007 WL 4207903, at *17 (Tenn. Crim. App. at Knoxville, Nov. 29, 2007), aff'd, 284 S.W.3d 227 (Tenn. 2009).

Bowman said that she knew Chattin before Deputy Bond's murder, explaining that they were introduced by Bowman's niece and friend. Bowman had also met Chattin's wife, Tina Hunt. Bowman spent time with Chattin, and they used methamphetamine together. Bowman eventually was convicted in federal court for "methamphetamine conspiracy" and had served her sentence. At the time of the post-conviction hearing, Bowman was on supervised release.

Bowman said that sometime in the weeks prior to Deputy Bond's murder, she was in her living room with Chattin and Greg Drake, and Chattin began "ranting and raving" about his suspicions that Hunt was having an affair with someone who worked at a Sonic restaurant. Chattin asked if Bowman knew about the affair, and Bowman responded that she did not. Chattin and Drake then walked onto the back porch, and Bowman was unable to hear their conversation.

Bowman said that on another occasion, Chattin came to her residence claiming "he knew for a fact that [Hunt] was having an affair." He again asked Bowman if she knew anything about the affair, and she repeated that she did not. On that occasion, Chattin accused Hunt of "messing with some police officer." Bowman cautioned Chattin to be careful, saying "you're doing this stuff and you're going to get us all busted." Chattin told her not to worry.

Bowman said that she saw Chattin again after Deputy Bond was killed. She recalled that she had been to Walmart and was driving home when she saw Chattin "speeding up behind" her. Bowman "pulled up" and parked her car. Chattin parked directly behind her, got out of his car, and began rubbing his hands together. As he walked by her car, Bowman asked what was wrong with him. Chattin responded that he "shot that mother-f[*****]g police officer" and that he needed to speak with Drake. Bowman told him Drake was asleep, and Chattin told her to wake him. Bowman went inside the residence, woke Drake, and told him what Chattin had said. He and Chattin talked in the living room then moved to the back porch. Bowman explained that through an outside intercom system, she overheard Chattin say, "I got rid of that mother-f[****]r, I shot him."

Bowman said that at the time of the Petitioner's trial, she was using methamphetamine every day and "was not [her]self." Bowman suffered a stroke in 2008 and had two "nervous breakdowns," and she decided to tell the truth to relieve the stress she had felt "all these years." She stated that the Petitioner "is innocent, he did not kill, he did not kill that police officer, I heard Mike Chattin tell me himself." Bowman maintained that she had met the Petitioner only once when she gave him a ride home, that they were not close friends, and that they had not spoken to each other except to say "hi."

On cross-examination, Bowman said that around the time of the offense, the Petitioner came to her house once or twice a week to "hang out." Around that time, she was using crystal methamphetamine five or six times per day. She was able to work but was always high. She also sold methamphetamine and was convicted of manufacturing methamphetamine. She said that she last used methamphetamine on Thanksgiving Day 2001 and that she received drug treatment while in prison. She used methamphetamine for two years and was seeing a psychiatrist once a week because she was "still suffering . . . from doing that drug." The use of methamphetamine affected her memory and made her paranoid and "start seeing things."

Bowman stated that in 2008, she had a stroke, which was caused by stress. The stroke paralyzed her left side and left her unable to speak, but she ultimately recovered. The stroke also affected her memory, but she could still recall "traumatic" events. Although she could not "remember the day or word for word," she remembered overhearing Chattin say "that he killed that police officer." She acknowledged that she also lied at the Petitioner's trial when she said that she and Drake "were common law husband and wife," noting their relationship lasted only two years.

Bowman said that while she was in federal prison, she was asked to "drop some buyer's names" to prosecutors in order to obtain a lesser sentence. However, she did not know any names to provide, so she "had to do ten years, day to day, living in hell." She said that while she was in prison, she learned of the Petitioner's trial.

Bowman said that the incident where the biker threatened her in a Walmart parking lot occurred shortly after Deputy Bond was murdered. She denied "making it up" due to paranoia from her extended use of methamphetamine. However, she acknowledged being "paranoid during that period of that time." Bowman recalled that she was contacted about testifying for the Petitioner two or two and a half years prior to the post-conviction hearing but was unable to remember who contacted her. She was unable to remember if she had ever had a conversation with the Petitioner. She acknowledged that her memory of the past ten to twelve years was "clouded" but said the memory problems were caused by the stroke, not the use of methamphetamine. However, when asked about the effect of crystal methamphetamine on her life, she responded, "It ruined it."

On redirect examination, Bowman again asserted that she could remember the events about which she testified, specifically Chattin's statements about killing a police officer. She said that when she, Drake, and Chattin were in her living room, Chattin talked about Hunt's affair with a man who worked at Sonic. During the conversation, Chattin told Drake that if they ever got in trouble, Drake should not "say anything about where all those guns came from." Drake asked Chattin why, and Chattin responded that Hunt was "f[*****]g an officer, a police officer." Thereafter, Bowman and Drake saw a

- 12 -

report on the television news that a policeman had been shot and killed. Bowman "looked over at Greg [Drake] and said oh my God, Mike [Chattin] did it."

Gray[2] testified that she met Chattin at the end of 2007. He became her boyfriend, and they lived together until he passed away. Chattin told her about his relationship with Hunt. Chattin believed that Hunt "cheated on him" with a "few people," including a police officer. Chattin said that he followed Hunt and that he "was a good stalker." Chattin talked with Gray about Deputy Bond's murder, and at one point, Gray accused Chattin of killing Deputy Bond, but Chattin "didn't deny, he didn't say he did or didn't."

On cross-examination, Gray acknowledged that during their relationship, Chattin used crack cocaine, crystal methamphetamine, and marijuana. Gray said that she did not use any drugs. Gray acknowledged that she never called the police or told anyone about her concerns, explaining that she did not tell the police about Chattin's silence because "he didn't answer. What could I say? . . . [I]t's nothing nobody didn't already know." She said she loved Chattin and continued to live with him even though she thought he had killed someone.

On redirect examination, Gray said that most of the time, Chattin treated her "very poorly" and was "[e]xtremely" violent towards her. She thought "[e]verybody that knew [Chattin] knew his character, they knew he was violent." Gray recalled that when she accused Chattin of murdering Deputy Bond, Chattin made a facial expression that was a "mean smile, intimidating, with one eyebrow raised."

Pardue's affidavit, which was obtained by defense Investigator Shawn Cunningham, reflected that Pardue knew Chattin "prior to dating him" and "knew of" his wife, Hunt. Pardue and Chattin dated for two years, during which he was abusive, intimidating and threatening. On one occasion, he caused "serious injuries to her face." Chattin also had mental issues and used methamphetamine. Pardue tolerated the abuse because Chattin had cancer.

According to the affidavit, Chattin told Pardue that "there was a fruit stand and some one got shot. . . . Chattin and another male went to burn the fruit stand and the officer got shot." Pardue described the man with Chattin as "a big guy" and said that he "took the officer's vest and gun." However, she later said that "Chattin took the cop's vest off and shot the cop." Pardue said that after the shooting, Chattin went to Carl Bishop's house to call the police. Chattin told her the "time delay in reporting the murder to the police is what almost got him burned." Pardue maintained that "Chattin said they tried to trick him on the stand and that the [trial] went on for days, so he faked a nervous break down."

---

[2] Gray's name was previously Lisa Dooley.

- 13 -

Pardue initially stated in the affidavit that Chattin told the police the Petitioner stole his truck and that the Petitioner came into the house and showed Deputy Bond's vest to Chattin. However, later in the affidavit, Pardue said that Chattin told her, "[I]t was a pleasure taking that vest." Pardue recalled that Chattin said "he ambushed the officer and that he did not know what hit him. That he was behind the truck."

Regarding when Chattin told her about killing Deputy Bond, Pardue said that "it was warm." Pardue first stated that she was not sure Chattin said the Petitioner was present during Deputy Bond's murder. She later claimed Chattin never said the Petitioner was with him during the murder, noting that the only time the Petitioner's name was mentioned was "in regards to returning to the house."

At the coram nobis hearing, Reynolds testified that in 2001, he did not know the Petitioner or Chattin. However, one afternoon, Marcus Goforth[3] drove Reynolds and a woman named Becky to Chattin's residence on East Brainerd Road. Goforth parked in front of a detached garage, and he and Becky went inside the residence to attempt to purchase marijuana. Goforth told Reynolds to stay in the car because the people at the residence did not know Reynolds. Despite Goforth's warning, Reynolds got out of the car and stood next to the front of the car, smoking cigarettes. While he was smoking, a tall, slender man and another man dressed only in his underwear and holding a pistol walked from behind the garage toward him. The armed man appeared to be "enraged," and Reynolds heard him say, "'If I find out that pig f[****]r is going back down to that store at nighttime, . . . I'm going to kill his f[*****]g ass.'" Reynolds "was not a usual customer" and became scared when the men noticed him. The men were walking back behind the garage when Goforth and Becky exited the residence. Reynolds, Goforth, and Becky left without incident. Goforth and Becky identified the armed man as "Spiderweb Mike," which was Chattin's[4] nickname.

Reynolds recalled that Deputy Bond was killed the next morning and that he knew from television news reports that the murder occurred "down the street from the house that they were showing, and whoever was apprehended was apprehended at the residence." He recognized the residence as the house at which he had been with Goforth and Becky. Reynolds assumed that Chattin killed Deputy Bond. Reynolds said that after Chattin passed away, he saw a photograph of Chattin with his obituary. From the photograph, Reynolds confirmed that Chattin was the armed man who threatened to kill a police officer the day before Deputy Bond's murder.

---

[3] Reynolds said he thought Goforth was deceased at the time of the hearing, and he did not know Becky's last name.

[4] Reynolds occasionally referred to Chattin as "Chapman."

- 14 -

Reynolds said that in 2002, he was convicted of carjacking and was incarcerated until 2015; therefore, he was not around anyone who cared about the murder. After his release, he attended a barbecue and heard someone talking about a "free Marlon Kiser website." When Reynolds saw a photograph of the Petitioner, he realized the Petitioner was not the armed man he heard threaten a police officer prior to Deputy Bond's murder. He decided that he should tell someone about the statement he heard.

Reynolds did not tell the police about the statement but told an individual "from our little community." The individual knew the Petitioner's family and conveyed the information to the Petitioner's brother. Thereafter, the Petitioner's brother met with Reynolds and Reynolds' father and asked Reynolds to help the Petitioner. Reynolds said that he "felt guilty because maybe I should have said something beforehand." He agreed to testify at the coram nobis hearing because he was not sure the police had arrested the right person.

On cross-examination, Reynolds acknowledged that he did not have any "firsthand knowledge about the case." Reynolds explained that he did not tell law enforcement about Chattin's statement immediately because he did not know it "would make any difference," did not "know what was fact or fiction," and did not know "what had took place or who was guilty or who wasn't guilty." After he spoke with the Petitioner's brother, he realized the seriousness of the situation. Nevertheless, Reynolds acknowledged that when he heard Chattin's statement, he did not know to whom Chattin was referring or the context of the statement.

In sum, the coram nobis court considered the testimony of Bowman and Gray, who testified at the post-conviction hearing; the affidavit of Pardue, which was introduced at the post-conviction hearing; and the testimony of Reynolds, who testified at the error coram nobis hearing, to determine whether the Petitioner was entitled to coram nobis relief. The coram nobis court found that the proof the Petitioner adduced in support of his petition was not credible and was cumulative to the proof adduced at trial. The coram nobis court further found that the Petitioner had failed to show that the proof might have affected the verdict at the Petitioner's trial. Accordingly, the court denied the coram nobis petition. On appeal, the Petitioner challenges this ruling.

## II. Analysis

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 and provides as follows:

> There is hereby made available to convicted defendants in
> criminal cases a proceeding in the nature of a writ of error

- 15 -

coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith . . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis omitted).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527 (emphasis omitted). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

Recanted testimony may be considered newly discovered evidence under certain circumstances. See Mixon, 983 S.W.2d at 672. This court has concluded that a trial

- 16 -

court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing Mixon, 983 S.W.2d at 673 n.17).

On appeal, the Petitioner contends that the proof he adduced in support of his error coram nobis petition established that Chattin, not he, murdered Deputy Bond. He asserts the coram nobis court should have found that Bowman's recanted testimony was truthful and that her trial testimony was false, arguing that she gave "very good and believable reasons" for lying at trial. The Petitioner further contends that Gray's testimony and Pardue's affidavit were consistent with Bowman's testimony and refuted Chattin's trial testimony that the Petitioner committed the murder. The Petitioner also contends that Reynolds' testimony "was completely credible." Essentially, the Petitioner asks this court to reassess the coram nobis court's credibility findings. The State responds that the coram nobis court correctly denied relief. We agree with the State.

The coram nobis court noted that at trial, Drake and Bowman testified consistently with each other that Chattin told them the Petitioner killed a police officer. Later, only Bowman recanted her trial testimony. Bowman testified that Chattin made statements implicating himself, not the Petitioner, in the killing of a police officer; Drake did not recant his trial testimony or testify at either the post-conviction hearing or the coram nobis hearing. The coram nobis court found, after closely observing Bowman as she testified, that "[i]t was apparent she has memory issues and a degree of confusion which affected her credibility as a witness." The court noted that "a great deal of time" passed before Bowman decided to change her testimony. Accordingly, the coram nobis court was "not reasonably well satisfied with the veracity of" her testimony and found that her testimony did not entitle the Petitioner to coram nobis relief. It is well-established that "[t]he assessment of witness credibility is entrusted to the sound discretion of the [coram nobis] court." Johnson v. State, 370 S.W.3d 694, 700 (Tenn. Crim. App. 2011). We will not reassess the coram nobis court's credibility findings.

Next, the coram nobis court noted that Gray did not testify at the Petitioner's trial; however, her testimony at the hearing provided that Chattin suspected his wife, Hunt, was

having an affair with a police officer. The coram nobis court further noted that Gray testified only that "she was suspicious Chattin could have killed [Deputy] Bond," and that Chattin "never made any statement to [Gray] in which he either admitted or denied it despite her asking him." The coram nobis court stated that even if it assumed that Gray's testimony "satisfied the veracity requirements," it did not "find her mere suspicions" qualified as new evidence or that her suspicions might have affected the outcome of the trial. See State v. Robert Wayne Turner, No. 01C01-9405-CC-00173, 1995 WL 293031, at *6 (Tenn. Crim. App. at Nashville, May 16, 1995) (stating evidence that was circumstantial, inconclusive, and speculative was not newly discovered evidence entitling a defendant to coram nobis relief). Again, the coram nobis court did not abuse its discretion by denying coram nobis relief on this basis.

Regarding Pardue, the coram nobis court observed that Pardue did not testify at the Petitioner's trial. The coram nobis court found that her affidavit contained "conflicting statements and details." We agree. The coram nobis court specifically noted that when Chattin told Pardue he committed the offense with another male, whom he described as a "'big guy,'" he could have been describing the Petitioner. The coram nobis court found that Pardue's affidavit lacked credibility and, thus, did not entitle the Petitioner to relief. Hart, 911 S.W.2d at 375 (explaining that if the coram nobis court does not believe the witnesses presented in support of the coram nobis petition, the court should deny the petition). The coram nobis court did not abuse its discretion by denying coram nobis relief on this basis.

The coram nobis court stated that although Reynolds testified that Chattin threatened to kill a police officer shortly before Deputy Bond was killed, Reynolds did not hear the context of the statement or a motive for the killing. Further, the coram nobis court observed that the Petitioner's theory of defense at trial was that Chattin killed Deputy Bond because he thought his wife was having an affair with a police officer and that the Petitioner adduced proof in support of the defense. Accordingly, the coram nobis court concluded that Reynolds' testimony was "merely . . . cumulative to other evidence presented [at trial] related to this issue." See Kiser, 284 S.W.3d at 238-39. Our supreme court has stated, "Newly discovered evidence that is merely cumulative or serves no other purpose than to contradict or impeach does not warrant coram nobis relief." State v. Hall, 461 S.W.3d 469, 495 (Tenn. 2015) (internal quotation marks and citations omitted). The coram nobis court found that the Petitioner had failed to show that the evidence might have affected the verdict at trial and determined that the Petitioner was not entitled to relief based upon Reynolds' testimony. We agree and conclude that the coram nobis court did not abuse its discretion by denying relief on this basis.

### III.  Conclusion

In sum, we conclude that the coram nobis court did not abuse its discretion by denying relief.

_____
NORMA MCGEE OGLE, JUDGE