# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## ERSKINE LEROY JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P29609      John P. Colton, Jr., Judge**

---

**No. W2010-01800-CCA-R3-CO  - Filed December 9, 2011**

---

The Petitioner, Erskine Leroy Johnson, appeals the Shelby County Criminal Court's dismissal of his petition for a writ of error coram nobis from his 1985 conviction for felony murder.  He contends that newly discovered evidence entitles him to a new trial.  He also contends that the trial court improperly weighed the newly discovered evidence and failed to assess that evidence in the context of the evidentiary record as a whole in determining whether the result of the trial may have been different.  We reverse the judgment of the trial court, vacate the Petitioner's felony murder conviction, and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed, Conviction Vacated, and Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL AND NORMA MCGEE OGLE, JJ., joined.

Gerald D. Skahan, Memphis, Tennessee, and Jonathan I. Blackman, David E. Brodsky, Carmine D. Boccuzzi, Jr., David H. Herrington, and Elizabeth Vicens, New York, New York, for the appellant, Erskine Leroy Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The record reflects that on December 7, 1985, the Petitioner was convicted of felony murder and sentenced to death.  The facts of this case were stated by our supreme court on direct appeal:

Between 8:30 and 9:00 a.m. on 2 October 1983 Joe Belenchia, owner of a Food Rite grocery in Memphis, was killed in the course of an attempted robbery. An eyewitness to the holdup[, Tommy Perkins,] made an in-court identification of the defendant as the person who killed Mr. Belenchia. He had also made a pretrial identification of defendant from a photo display. He further identified Jerome Moreland, a friend of defendant's, who was also involved. The witness was not 100% sure of his identification at trial and only "pretty sure" of his pretrial identification. . . . This witness had also seen a Burgundy-colored station wagon in the store parking lot with two people in the front and two in the back. One of the passengers in the rear seat was a female. This vehicle was subsequently linked to the crime. Earlier in the morning of the robbery a young boy saw a man switching license plates from a car parked in the street to a maroon station wagon. Three people were in the station wagon and the man switching the license plate was observed talking to a woman in a white car. The number on the license plate was the same as the number on the vehicle used in the robbery. A palm print taken from this vehicle was subsequently identified as defendant's. Defendant was wearing an orange or rust colored suede or leather jacket which was identified by at least two witnesses to the robbery. Another witness in the grocery store at the time of the robbery testified that a woman, accompanied by a man, attempted to get into the store office. She was carrying a brown paper bag in her hand. She was prevented from doing so by the security guard who in turn was restrained by the man, who put a gun to his head. At that time the witness heard the sound of three shots coming from the front of the store. During the police investigation the maroon station wagon was traced to the St. Louis Airport. Defendant's cousin, Elizabeth Starks, testified that defendant and another man named Jerome came to her home the night before the homicide. They were traveling in a maroon station wagon. The next morning defendant, Jerome and another man came to her residence. Her boyfriend, Dennis Williams went with the three men to the store for cake mix about 7:00 a.m. When Mr. Williams returned he was pale and acted exhausted and upset. Subsequently defendant, Jerome and a third man returned to her house. A woman in a white car also

came there. As previously noted, the witness Beverly Batts testified that several months later defendant told her he and two friends had stolen a car from the St. Louis Airport and he had committed a robbery and murder in Memphis.

Defendant offered an alibi defense through a number of witnesses who testified that on the night of 1 October 1983 and the morning of 2 October 1983 he was in St. Louis at a birthday party for his mother. He testified that he attended the birthday party and on the following morning took his children to his mother's house in order to attend church. He denied knowing Ms. Starks and said that Ms. Batts told him she would keep him in jail because he would not pay her bail in California.

State v. Johnson, 762 S.W.2d 110, 115-16 (Tenn. 1988). The court affirmed the Petitioner's conviction and death sentence. Id. at 120.

The Petitioner filed a petition for post-conviction relief claiming that the State withheld exculpatory evidence at the trial that "would have shown that another 'group' committed these offenses; . . . strengthened his alibi defense; and it could have been used to impeach Beverly Batts, who testified for the State that Defendant had confessed to the murder." Erskine Leroy Johnson v. State, No. 02C01-9707-CR-00292, Shelby County, slip op. at 5 (Tenn. Crim. App. Aug. 12, 1999). This court agreed with the Petitioner that the State withheld exculpatory evidence, including evidence that (1) Johnnie L. Wilborn, a customer in the grocery store during the robbery, was shown twenty-four photographs, including a photograph of the Petitioner, and picked out a photograph of Michael Brown as looking like the gunman; (2) Harold Quarles, who testified at the trial, was shown a photograph lineup by the police that included a photograph of the Petitioner, but Mr. Quarles identified Michael Brown and Charles Keller as looking like the two individuals he saw changing the license plate on the getaway vehicle before the shooting occurred; (3) Miles McKinney identified the getaway car as being used by Darvi Cunningham, a prostitute working for Eric Brown, Michael Brown's brother, months before the shooting; (4) Eric Brown, Michael Brown, and Charles Keller were involved in a car theft ring which stole rental cars from the St. Louis Airport; (5) a police report showing that the Petitioner's fingerprints did not match any of the fingerprints removed from the vehicle; and (6) a police report listing the places in the getaway car from which the prints were lifted, on which the location from where the Petitioner's palm print was alleged to have been taken was not listed. Id. at 6-11.

Despite finding this undisclosed evidence to be exculpatory, this court held that the evidence was not material and that the State's failure to disclose the evidence did not undermine confidence in the guilty verdict because

> [t]he circumstantial proof linking Defendant to this shooting is strong. In addition to Mr. Perkins's identification of Defendant as the shooter, Defendant's palm print was found on the getaway car. Moreover, despite Defendant's claim that he was in St. Louis at the time of the shooting, his cousin, Elizabeth Starks, identified him as being in Memphis on the day of the shooting and identified him as being in the getaway car. She further testified that she and a friend had been in that car prior to the robbery. Her testimony was corroborated by the presence of their fingerprints in the car. Furthermore, Beverly Batts testified that Defendant confessed to a "cold-blooded" shooting in Memphis.
>
> . . .
>
> The identification by Perkins, the corroborated testimony of Starks, Defendant's admission to Batts, and Defendant's palm print on the getaway car have not been overcome.

Id. at 9-10. This court affirmed the conviction, but remanded the case for a new capital sentencing hearing after determining that the failure of the State to disclose an exculpatory police report, which indicated that the Petitioner did not fire a bullet that grazed a bystander and that the victim had a gun, resulted in the jury's arguable misapplication of the "great risk of death" aggravating circumstance. Id. at 18, 41. The ruling was affirmed by our supreme court. See Johnson v. State, 38 S.W.3d 52, 63 (Tenn. 2001). On remand, the State did not seek the death penalty, and the trial court sentenced the Petitioner to life imprisonment.

On April 22, 2005, the Petitioner filed a petition for writ of error coram nobis, claiming that he was entitled to a new trial based upon newly discovered evidence because: (1) Dennis Williams, who identified the Petitioner as a perpetrator of the robbery and corroborated the testimony of Elizabeth Starks, recanted his trial testimony and an earlier statement provided to the police and now states that he never met the Petitioner and lied due to police pressure and a desire to protect Ms. Starks, who was his girlfriend at the time; (2) he learned during his investigation for his resentencing hearing that Elizabeth Starks, a key witness for the prosecution, had a close personal relationship with Betty Jo Ford, a member of the "Brown Gang," and, therefore, had a motive to testify against the Petitioner in order

-4-

to protect Ford; and (3) Tommy Perkins, an eyewitness who identified the Petitioner as the man who shot the victim, stated that the State advised him just before he testified at the trial that the Petitioner may have changed his appearance to make an identification more difficult, which he understood as an indication that he should identify the Petitioner as the shooter even if he did not recognize the Petitioner. The Petitioner argued that the newly discovered evidence undermined the State's evidence and strengthened his defense that the "Brown Gang" was responsible for the murder and that the newly discovered evidence, when considered in conjunction with the suppressed exculpatory evidence, overwhelmingly demonstrated the likelihood that the jury may have reached a different result had they heard all of the evidence.

Several affidavits were attached to the petition. In the first affidavit, Dennis Williams stated that he lied when he told the police that the Petitioner was one of the individuals who visited Ms. Starks's home on the weekend of October 1, 1983. He stated that he lied because the police threatened to take away his grant of immunity if he did not tell the truth, the police told him that Ms. Starks said the Petitioner was at her home, and the police identified her version of the events as the truth. In the second affidavit, Darvi Cunningham stated that she had known Betty Jo Ford since 1982 and that she met Ms. Starks through Ms. Ford. She said Ms. Ford and Ms. Starks were very close and told her that they were first cousins. In the third affidavit, Tommy Perkins stated that the State advised him just before he testified at the trial that the Petitioner may have changed his appearance to make an identification more difficult, which he understood as an indication that he should identify the Petitioner as the shooter even if he did not recognize the Petitioner. He said that he was not sure when he identified the Petitioner at the trial as the man he saw shoot the victim and that his identification was based in part on photographs of the Petitioner previously shown to him by the police. He said the police previously stated that they caught the shooter and then showed him photographs of only the Petitioner when asking him to identify the shooter.

At the hearing on the petition, Richard Walker testified that from the age of nine until his mid-twenties, he saw Ms. Starks frequently because they each sang in gospel groups in Memphis. Ms. Starks introduced him to Ms. Ford when he was in high school. He said that Ms. Starks and Ms. Ford were "pretty tight. . . like partners" and that he frequently saw them together. Mr. Walker began dating Ms. Ford shortly after being introduced to her and she became pregnant with his child. He said that he lost touch with Ms. Ford after the baby was born but that whenever he ran into Ms. Starks, she would tell him about Ms. Ford.

On cross-examination, Mr. Walker testified that the last time he saw Ms. Ford was in 1980 and agreed that the close relationship he observed between Ms. Ford and Ms. Starks

was what he observed before 1980. He did not know the status of their relationship after 1980.

Joe Roy Robinson testified that in 1982, he "hung out" with Ms. Ford and Ms. Starks at a club called the Executive Lounge. He said that Ms. Ford and Ms. Starks came to the club together and that he saw them almost every weekend. He said that the two women were "real close" and that he thought they were related. Almost every time he saw Ms. Starks, Ms. Ford was with her. He said that Ms. Starks, Ms. Ford, and a woman named Darvi Cunningham worked as prostitutes for his brothers and that the three women frequently spent time together. On cross-examination, Mr. Robinson testified that over the course of four or five years, he frequently saw Ms. Starks and Ms. Ford together.

Melvin Hoyle testified that he managed the Executive Lounge from 1977 until 1984. He said that Ms. Starks frequently came to the club on weekends with Ms. Ford and that Ms. Starks introduced him to Ms. Ford. He said that the women were "real close" and that he thought they were related. On cross-examination, Mr. Hoyle testified that he never asked Ms. Ford or Ms. Starks if they were related. On re-direct examination, Mr. Hoyle testified that his observations of the two women led him to believe that they were cousins.

The trial court denied the petition after finding that the Petitioner was at fault for failing to discover the evidence in a timely manner and that the Petitioner failed to show that the evidence, if presented, "would have resulted in a different verdict." On appeal, this court concluded that due process required tolling the statute of limitations and that the trial court denied the petition based upon an incorrect standard. See Erskine Leroy Johnson v. State, No. W2007-01546-CCA-R3-CO, Shelby County, slip op. at 1 (Tenn. Crim. App. Sept. 30, 2009). This court reversed the denial of the petition and remanded to the trial court for reconsideration of the petition under the correct standard. Id.

On remand, the trial court again denied the petition after it concluded that the Petitioner failed to establish that the newly discovered evidence, if presented, may have resulted in a different verdict. With regard to the affidavit of Dennis Williams, the trial court found that it was not reasonably satisfied that Mr. Williams's previous testimony was false because he gave the statement with an attorney present and after being informed of his right to remain silent. The court stated:

> The mere fact that Mr. Williams now claims that he was intimidated and coerced does not suffice to warrant a new trial.

-6-

Even assuming that the new statement is true, this court is not reasonably satisfied that the jury may have reached a different verdict had they been aware of it . . . Williams' identification of Petitioner was merely a small piece of an otherwise strong case.

With regard to the affidavit of Tommy Lee Perkins, the trial court found that the jury was aware of facts that could have impeached Mr. Perkins's identification of the Petitioner because Mr. Perkins testified at the trial that he was "not a hundred percent" sure of his identification and that before his identification, the police told him that the suspect had been caught and showed him several photographs of the Petitioner. The trial court found that the additional evidence included in the affidavit, that Mr. Perkins was told by the State that the Petitioner may have changed his appearance to make an identification more difficult and that Mr. Perkins interpreted this as an indication that he should identify the Petitioner as the person responsible for the shooting, was merely impeachment evidence that built upon other impeachment evidence introduced during the trial. The trial court noted that Mr. Perkins did not claim that his identification was false or coerced and concluded that "[b]ecause the testimony of Mr. Perkins had already been significantly impeached, and perhaps discredited, this court is not reasonably satisfied that the presentation of this additional evidence may have caused the jury to reach a different verdict."

With regard to evidence showing the existence of a relationship between Ms. Starks and Ms. Ford, the trial court stated that the Petitioner had not shown that the evidence may have caused the jury to reach a different verdict because the evidence did not establish a "kinship relationship between Elizabeth Starks and Betty Jo Ford, nor any relationship for that matter," and did not establish that Ms. Starks would lie based solely on their alleged relationship. The trial court noted that "Elizabeth Starks has a kinship relationship with Petitioner and if she was inclined to lie based on a relationship, she would have done so on Petitioner's behalf." This appeal followed.

The Petitioner contends that the trial court erred by improperly weighing newly discovered evidence and by assessing each piece of evidence in isolation, rather than as a whole in the context of the entire evidentiary record, in determining whether the result of the trial may have been different had the newly discovered evidence been introduced at the trial. He argues that the newly discovered evidence, when considered in conjunction with the improperly withheld exculpatory evidence and the evidence introduced at the trial, entitles him to a new trial. The State contends that the trial court correctly determined that the affidavit of Mr. Williams was not credible and that the affidavit of Mr. Perkins did not amount to new evidence, and then properly determined that the evidence of Ms. Starks's relationship with Ms. Ford could not have resulted in a different judgment in the context of

the entire record. We conclude that the trial court erred in holding that the Petitioner failed to establish that the evidence of a relationship between Ms. Starks and Ms. Ford, had it been presented at the trial, may have resulted in a different judgment.

Tennessee Code Annotated section 40-26-105(b) states:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2010); see State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The decision to grant or deny such a writ rests within the sound discretion of the trial court. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). A petition for writ of error coram nobis must be filed within one year of the date the judgment becomes final in the trial court. T.C.A. § 27-7-103 (2010); State v. Mixon, 983 S.W.2d 661, 663 (Tenn. 1999); State v. Ratliff, 71 S.W.3d 291, 295 (Tenn. Crim. App. 2001). Despite the one-year statute of limitations, due process may require tolling of the limitations period if a petitioner seeks relief based upon newly discovered evidence of actual innocence. Harris, 301 S.W.3d at 145; Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001).

> [I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007).

> A new trial should be granted upon the basis of newly discovered recanted testimony only if (1) the trial court is

reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001). The assessment of witness credibility is entrusted to the sound discretion of the trial court. See Hart, 911 S.W.2d at 375; Roland Bennett v. State, No. E2004-01416-CCA-R3-PC, Hamilton County, slip op. at 6 (Tenn. Crim. App. July 14, 2005) (holding that the trial court did not abuse its discretion in denying error coram nobis relief after determining that a witness who recanted previous testimony was not credible), app. denied (Tenn. Dec. 5, 2005).

Before we determine whether the trial court erred in its assessment of the evidence admitted at the coram nobis hearing, we must first determine whether this evidence should have been considered only in light of the evidence admitted at the trial or whether the entire record should be taken into account, including the wrongfully withheld exculpatory evidence that was not discovered until after the trial. We have found no case on point with the unique situation facing the Petitioner, who, after the trial, discovered exculpatory evidence that a post-conviction court deemed to be wrongly withheld but not sufficiently material to warrant a reversal of the guilty verdict, and then subsequently discovered additional evidence that potentially undermined the verdict and the rationale underlying the post-conviction court's holding. Although this court has determined that suppressed exculpatory evidence can amount to newly discovered evidence and can be considered by an error coram nobis court, it has not addressed whether wrongly suppressed exculpatory evidence may be considered in conjunction with newly discovered evidence that was found after the exculpatory evidence was previously presented to a post-conviction court. See Freshwater v. State, 160 S.W.3d 548, 555-56 (Tenn. Crim. App. 2004)

Our supreme court has stated that in determining whether newly discovered evidence may have led to a different result, "the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding . . . ." Vasques, 221 S.W.3d at 527. We note that in the same opinion, the court stated that in determining whether error coram nobis relief was warranted, it would "carefully consider all of the proof in the context of the new information offered at the coram nobis proceeding." Id. at 522 (emphasis added). Here, a finding that the trial court should consider the newly discovered evidence only in conjunction with the evidence submitted at trial would require the court to ignore evidence that this court

previously determined was exculpatory and should have been made available for the Petitioners's use at the trial. See Erskine Leroy Johnson, slip op. at 6-11. We hold that when determining whether error coram nobis relief was warranted, the newly discovered evidence should be considered in light of the evidence introduced at the trial and the improperly withheld exculpatory evidence that this court previously determined should have been made available for use at the trial.

The Petitioner contends that the trial court erred by considering each piece of newly discovered evidence in isolation, rather than as a whole, in determining whether the result of the trial may have been different. We disagree. Although the trial court made specific findings with regard to each piece of evidence and individually rejected the argument that each piece of evidence may have resulted in a different judgment had it been presented at the trial, the trial court ultimately concluded that the Petitioner failed to establish "that the newly discovered evidence, if presented, may have resulted in a different verdict. Petitioner has not met this burden with regard to all pieces of evidence heretofore presented." Additionally, the record reflects that the trial court considered the newly discovered evidence in conjunction with the wrongly suppressed evidence and the evidence introduced at the trial, as it found that the evidence establishing a relationship between Ms. Starks and Ms. Ford provided "a further link between the Brown gang and the Belenchia homicide." The Petitioner is not entitled to relief on this claim.

The Petitioner also contends that the trial court improperly weighed and assessed the newly discovered evidence in determining whether the result of the trial may have been different. With regard to the affidavit of Mr. Williams, the trial court was not satisfied that his new testimony was true and his previous testimony was false. The Petitioner contends that the trial court improperly assessed this evidence because Mr. Williams's affidavit states that he lied because the police threatened to take away a grant of immunity if he did not tell the truth, that the police insisted that Ms. Starks's version of events was the truth, and that he did not want to get Ms. Starks into trouble by contradicting what she told the police. The State contends that the trial court properly rejected this evidence after determining that it was not credible. We conclude that the trial court did not abuse its discretion in determining that Mr. Williams's testimony contained in the affidavit was not credible.

The record reflects that Mr. Williams had an attorney negotiate a signed immunity agreement with the State before he agreed to speak with the police. As noted by the trial court, Mr. Williams gave his original statement with an attorney present and after being informed of his right to remain silent. We note that Mr. Williams did not testify at the error coram nobis hearing and that the trial court's assessment of his credibility was limited to the evidence contained in the record and his affidavit. In light of evidence showing that Mr.

-10-

Williams had a preexisting signed immunity agreement, that an attorney was present to thwart police interrogation tactics, and that he could have remained silent and not contradicted Ms. Starks's testimony, we conclude that the trial court did not abuse its discretion in determining that the testimony of Mr. Williams contained in the affidavit was not credible.

With regard to the affidavit of Tommy Lee Perkins, the Petitioner contends that the trial court erred in its assessment of this evidence because it gave no weight to the fact that the only eyewitness to identify the Petitioner had his testimony significantly impeached. The State contends that the trial court properly rejected this evidence because it did not constitute newly discovered evidence and that the Petitioner did not establish that the evidence may have affected the judgment had it been presented at the trial. We agree with the State.

In denying relief, the trial court did not expressly find that the affidavit was not newly discovered evidence. Rather, it stated that the affidavit was merely cumulative impeachment evidence that built upon impeachment evidence offered at the trial and that because Mr. Perkins's testimony was significantly impeached at the trial, it was not satisfied that presentation of the additional impeachment evidence may have affected the verdict. The fact that Mr. Perkins now states that the State approached him shortly before he testified and told him the Petitioner may have changed his appearance to make an identification more difficult does not amount to newly discovered evidence that the Petitioner was without fault for failing to present at the proper time. The Petitioner could have elicited this impeachment evidence at the trial during cross-examination of Mr. Perkins and did so with regard to similar impeachment evidence. The Petitioner elicited testimony that Mr. Perkins was "not a hundred percent" sure of his identification and that prior to his identification, the police conditioned his identification by telling him that the suspect had been caught and showing him several photographs of the Petitioner. A follow-up question asking if the State otherwise conditioned his identification would have produced the testimony that the Petitioner now asserts constitutes newly discovered evidence.

The trial court correctly noted that Mr. Perkins's identification of the Petitioner was significantly impeached at the trial. The cumulative impeachment evidence contained in the affidavit would have done little to impeach Mr. Perkins's already questionable identification. We conclude that the trial court did not err in rejecting the notion that the presentation of this additional evidence, when considered in light of the entire record, may have caused the jury to reach a different verdict.

With regard to evidence indicating a relationship between Ms. Starks and Ms. Ford, the Petitioner contends that the trial court erred in its assessment of this evidence by only

considering the impeachment value of the evidence and disregarding its earlier finding that the evidence forged a connection between Ms. Starks and the Brown Gang and further implicated the Brown Gang as responsible for the murder. The State contends that the trial court did not err in its assessment of this evidence because other evidence in the record supports the finding of guilt. We agree with the Petitioner.

The trial court found that the testimony of witnesses at the error coram nobis hearing and the evidence contained in Darvi Cunningham's affidavit tended to establish that "Elizabeth Starks and Betty Joe Ford, a prostitute for the Brown Gang, were close friends who may have even held themselves out as cousins." The court held that the evidence, if true,

> would serve to impeach the testimony of Elizabeth Starks because it would supply a motive for her, as perhaps a member of the Brown gang, to point the investigation towards another suspect. This would also provide a further link between the Brown gang and the Belenchia homicide because if Starks were a member of the Brown gang, who were being investigated for the crime, and she falsely implicated an unrelated party, then this would tend to implicate the Browns as trying to divert investigative attention from their group.

Despite these findings, the trial court concluded that the Petitioner had not shown that this additional evidence may have caused the jury to reach a different verdict because the evidence did not establish a "kinship relationship" between Ms. Starks and Ms. Ford and did not establish that Ms. Starks would lie based solely on their relationship. The trial court noted that "Elizabeth Starks has a kinship relationship with Petitioner and if she was inclined to lie based on a relationship, she would have done so on Petitioner's behalf." However, the trial court did not state that it ever questioned the credibility of Ms. Cunningham, Mr. Walker, Mr. Robinson, or Mr. Hoyle. Instead, it noted that their testimony undermined Ms. Starks's credibility as a witness and provided a further link between the Brown Gang and the Belenchia homicide. It also noted that the evidence supplied a motive for Ms. Starks to lie and point the investigation away from the Brown Gang and towards another suspect. Furthermore, although the trial court stated that Ms. Starks would have lied for the Petitioner, her cousin, if she were inclined to lie based on a relationship, that finding is not supported by the record. The record reflects that although Ms. Starks was related to the Petitioner, she did not know the Petitioner, had not met him until the night before the murder when he was introduced to her as her cousin, and had never heard that she had a cousin named Erskine Johnson. In contrast to evidence of no relationship between Ms. Starks and the Petitioner,

the record reflects that she had a close relationship with Ms. Ford and a motive to protect Ms. Ford and the Brown Gang, who were being investigated for the crime. We conclude that the trial court abused its discretion by concluding that the Petitioner failed to show that evidence indicating a relationship between Ms. Starks and Ms. Ford may have caused the jury to reach a different verdict.

As noted by the trial court and this court, Ms. Starks was a "very important" witness for the State. Although Mr. Perkins's identification and Mr. Williams's trial testimony have not been overcome, Mr. Perkins's testimony was "significantly impeached, and perhaps discredited," while Mr. Williams's testimony now corroborates Ms. Starks, who has likewise been significantly impeached and discredited. We conclude that evidence tending to impeach Ms. Starks's testimony and forge a link between her and the Brown Gang, when considered in conjunction with multiple pieces of evidence implicating the Brown Gang and the evidence at the trial, including evidence that the sole eyewitness identifying the Petitioner as the shooter had his testimony significantly impeached, may have resulted in a different judgment had it been presented at the trial. We conclude that the trial court erred by denying the petition.

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court, vacate the Petitioner's felony murder conviction, and remand the case for a new trial.

_____
JOSEPH M. TIPTON , PRESIDING JUDGE