IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

**FREDERICK E. BRAXTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-732    Steve R. Dozier, Judge**

_____

**No. M2018-00443-CCA-R3-ECN**

_____

The Petitioner, Frederick E. Braxton, appeals the Davidson County Criminal Court's denial of his petition for a writ of error coram nobis from his attempted second degree murder conviction, for which he received a nineteen-year sentence. The Petitioner contends that the court erred by denying relief. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Frederick E. Braxton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the 2006 attempted killing of James Williams, for which the Petitioner and his codefendant were charged with attempted first degree murder but convicted of the lesser included offense of attempted second degree murder. *State v. Frederick Edward Braxton and Leonard Cardell Harris*, No. M2009-01735-CCA-R3-CD, 2011 WL 3809773 (Tenn. Crim. App. Aug. 26, 2011), *perm. app. denied* (Tenn. Jan. 10, 2012). The Petitioner and his codefendant appealed their respective convictions, and in the opinion affirming the convictions, this court summarized the facts of the case as follows:

On February 15, 2006, the victim, James Williams, was working at East Nashville Auto Sales located at 1413 Dickerson Pike. On that day, he noticed a car traveling down the street with "one of the defendants' brother in it." The victim did not think anything about it and continued "what [he] was doing at the time." He left work around 5:00 p.m. and drove toward downtown Nashville on Dickerson Pike, a four-lane road, to pick up his girlfriend. As he was driving in the left lane, the victim noticed "a green early nineties model - - uh - - Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim testified that he closed his sunroof "thinking that if [he] shut the sun roof the car would be dark and they wouldn't know who was in it, that they wouldn't open no fire on the car." He then moved into the right lane of Dickerson Pike in an attempt to get to the interstate and lose the other vehicle. The victim testified that when he stopped in traffic, the green car pulled up beside him with "two men hanging out the car shooting." He recognized the two men as Defendant Braxton and Defendant Harris whom he had known since the early 1990's, and their relationship was one of "bad blood." Although there were four people in the vehicle, the victim could not identify the other two. He said that Defendant Harris was in the front and Defendant Braxton was in the back. Both men were on the passenger's side of the car.

Upon realizing that he had been shot, the victim played dead and after the Defendants left, he drove to the AM/PM Market on North First Street and asked a lady there to call 9-1-1. He testified that he had been carrying a .40 caliber handgun at the time of the shooting that he tossed in a trash can before entering the market. The victim was then transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. The victim testified that one of the bullets struck him in the upper arm. He said:

> It went through the back and came out there. They had to put a metal plate right here . . . straight through in and out right here. It went through my - - one bullet went through my hand and lodged in my wrist, one in my finger and one in my mouth. And, it knocked my teeth out.

The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose. He said that he lost six teeth, and there were sixteen bullet holes in his car as a result of the shooting.

The victim testified that he received a visit from Detective Bradley at the hospital shortly after coming out of surgery, and he told Detective Bradley that he did not want to talk about what happened. The victim said that he intended to handle the situation himself but changed his mind after speaking with his mother who told him to think of his family and the pain that he would cause them by taking matters into his own hands. The victim testified that he spoke with Detective Bradley a second time and told him that Defendants Braxton and Harris shot him. Detective Bradley later returned to the hospital with photographic lineups, and the victim identified each Defendant. The victim admitted that he had previously been convicted of several criminal offenses. He further admitted that because he was a convicted felon, he broke the law by possessing the 40-caliber handgun at the time of the shooting.

The victim testified that after one particular court appearance on August 18, 2006, he saw Defendant Harris outside the courthouse. He made eye contact with Defendant Harris who said, "I'm gonna get you boy. So, be ready." He said that Defendant Harris then walked down the drive talking to his family and making gun-like gestures.

On an occasion prior to the shooting which is the subject of this case, the victim testified that in October of 2005, he arrived home around 1:30 or 2:00 a.m., and as he was walking through the breezeway to his residence, Defendant Harris and another individual opened fire on him. One of the bullets struck him in the foot. The victim testified that he shot at a third man who ran from the side of the building. He then hid under a neighbor's Jeep until Defendant Harris and the other men left. The victim testified that his sister called police, and when they arrived, he told them that everything was fine and that he would "handle it." He also told police that he did not know who shot at him. He said that he did not want police searching his house because he had two firearms on his person, and there were additional assault rifles in his home. The victim testified that he had driven by Defendant Harris' beauty shop prior to the incident.

Kenneth Miller testified that he left work on February 15, 2006, and dropped a passenger off at Dunlap and Kyle Tire on Dickerson Road. As he was sitting at a traffic light, he heard gunshots nearby. Mr. Miller testified that he "located two cars in [his] side mirror going in the opposite direction. The one car pulled up next to the other car and - uh - they started firing again." He further testified:

Uh - - when they fired again, I was watching in - - in my side mirror. Uh - - and, uh - - I saw - - uh - - either a black sleeve,

or a black arm, holding a black semi-automatic. I personally own a Tarurus (phonetic) [sic] nine [millimeter]. And, it had the same style and size as that. And, I could - - I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding.

Mr. Miller stated that he saw the arm protruding out of the passenger's side of the car. He then drove a short distance and called police. He was assured that officers were on the scene, and he drove back and talked to an officer there. Mr. Miller testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again." He said that when the shooting "started, it started." Mr. Miller did not know the model of the car involved in the shooting. He said that it was a "sedan-type" vehicle.

Detective Michael Wilson of the Metropolitan-Nashville Police Department testified that he . . . and Officer Jason Smith were standing on Joseph Avenue and Evanston late that afternoon and heard multiple gunshots. It sounded as though two different weapons were fired, and he could tell that the shots came from the Dickerson Road area. Detective Wilson and Officer Smith got into their cars and drove south on Dickerson Road to Cleveland Street. Detective Wilson testified that he pulled into the parking lot of the AM/PM Market and saw a small car parked in front of the gas pumps with blood inside it and twelve to fifteen bullet holes in the car on the driver's side. He walked inside the market and saw the victim, who was bleeding. One of the bullets had knocked out the victim's front teeth. Detective Wilson was unable to get much information from the victim before he was taken away by ambulance due to the trauma to his mouth.

. . . .

Officer Woodrow Ledford testified that he responded to the shooting on Dickerson Road. He drove to the AM/PM Market and was then instructed to move further up Dickerson Road around Dunlap and Kyle Tire to look for evidence. The area had businesses along the entire street, and there were several parking lots. Because he was there around 5:00 p.m., the area was "fairly congested" with traffic. Officer Ledford testified that the area had two northbound and two southbound lanes, was two to three miles from downtown Nashville, and was heavily populated. He said that there was not an actual entrance ramp to the interstate from Dickerson Road, but it could be accessed from Spring Street.

Officer Ledford testified that when he pulled into the parking lot . . . , a gentleman handed him "12 or so" spent shell casings that he had picked up. There was also a mirror from a vehicle. Officer Ledford also picked up five or six shell casings himself. He believed some of the casings were 40-caliber and some were smaller and appeared to be nine-millimeter. Officer Ledford gave the shell casings to another officer.

Officer Tommy Simpkins of the Metropolitan-Nashville Police Department . . . testified that he was dispatched to the AM/PM Market . . . and viewed a black, four-door Toyota Corolla. There were several bullet strikes in the vehicle, and he saw some projectile and projectile pieces. Officer Simpkins testified that there were no shell casings inside the Corolla. The windows were up and for the most part remained intact. There were holes on the front driver's door window and the rear driver's side window, and a bullet was found in the door frame of the driver's side. Officer Simpkins collected the victim's clothing, and a "slug" was retrieved from the trunk. He also found a tooth from the victim on the ground outside of the car. Officer Simpkins testified that he was given twelve spent shell casings by Officer Ledford. Seven of the casings were forty-caliber and five were nine-millimeter.

Detective Terrence Bradley testified that paramedics were treating the victim when he arrived at the AM/PM Market, and he followed the ambulance to the hospital. He spoke briefly with the victim who gave him a description of what happened. Detective Bradley testified that the victim gave him the names of Defendant Braxton and Defendant Harris. He said that the victim was in a lot of pain and did not want to talk any more. Detective Bradley then put together a photographic line-up and showed it to the victim at the hospital. The victim identified Defendant Braxton[] but could not write because his hands were immobilized. At that time, Detective Bradley had not located anything on Defendant Harris. He later found Defendant Harris in the system and put together another line-up. The victim identified Defendant Harris. Detective Bradley then obtained warrants on Defendants Harris and Braxton.

On cross-examination, Detective Bradley testified that he did not recall asking the victim who shot him while he and the victim were at the market. He said that he stopped talking to the victim at the hospital because the victim became uncomfortable. He did not remember the victim saying that he wanted to take care of things himself, and he probably saw the victim three times at the hospital.

. . . .

Derrica Christman testified that she was living in the Parkway Terrace Apartments in February of 2006. She met Defendant Braxton in the summer of 2005, and he frequently hung around the apartment complex. Ms. Christman testified that she remembered February 15, 2006, because it was the day after Valentine's Day, and her daughter had attended a dance at Stratford High School. Her daughter only attended Stratford for one year. Ms. Christman testified that her daughter was going to ask Defendant Braxton for a ride to the dance, but Ms. Christman's brother took her instead. She said that the following day, February 15, Defendant Braxton asked how the dance went.

Ms. Christman testified that she saw Defendant Braxton and several others shooting dice near her back porch "no later than" 5:15 on February 15, 2006. She was certain of the time because her children usually arrived home from daycare between 5:15 and 6:00 p.m., and she had to go out and get them off the bus.

On cross-examination, Ms. Christman testified that four or five people usually played dice at her back porch, and Defendant Braxton was frequently there. She said that she and Defendant Braxton had a conversation about her daughter's dance on February 15, 2006, and she saw him on February 13 and 14, but not February 11 and 12. Ms. Christman testified that she also saw Defendant Braxton on February 5 and 6, 2006, and she remembered seeing him in the area around her home on February 5. Ms. Christman said that she did not learn of the shooting until April of 2006 when she was trying to find out why Defendant Braxton was in jail. At the time, she did not tell police or anyone at the district attorney general's office that they had the wrong person. She said that she came forward in October of 2006 after speaking with Defendant Braxton. Ms. Christman acknowledged that her apartment was located near the 700 to 800 block of Dickerson Road.

. . . .

On rebuttal, Derrica Christman was recalled as a witness. She testified that if February 6, 2006, was a weekday, she saw Defendant Braxton after 5:00 p.m. She also saw him on February 13, 2006, between 5:00 and 5:15 walking from the building next door to hers. He was wearing the same jacket that she saw him wearing on February 15, 2006. On cross-examination, Ms. Christman said that she last saw Defendant Braxton eight days before February 13, 2006, and she was not sure that she saw him on February 6, 2006. She was certain that she saw him on February 13, 2006.

- 6 -

Wayne Miller, Records Technician for the Davidson County Sheriff's Office, testified that Defendant Braxton was in the custody of Sheriff's Office during February of 2006. He entered the facility at 2:12 p.m. on February 6, 2006, and he left at 4:27 p.m. on February 13, 2006.

Alfred Gray, an investigator for the district attorney general's office, testified that he spoke with Ms. Christman concerning Defendant Braxton's case. Ms. Christman told him that she remembered Defendant Braxton being outside of her home on the night of the shooting. She remembered the incident because it happened the day after Valentine's Day, and Defendant Braxton had been released from jail the day before Valentine's Day. Ms. Christman did not mention anything about her daughter's dance. Investigator Gray indicated that Ms. Christman's residence at Parkway Terrace was located a little less than two miles from the intersection of Grace and Dickerson Road where the shooting took place.

*Id.* at *1-6. The Petitioner did not seek post-conviction relief.

On November 13, 2017, the Petitioner filed the present petition for a writ of error coram nobis. He alleged actual innocence of attempted second degree murder based upon the victim's October 26, 2017 affidavit stating that the victim contacted the Petitioner's family asking for "forgiveness" because the victim "knowingly lied about identifying [the Petitioner] as the person who shot at [the victim] on February 15, 2006." The victim affirmed that he identified the Petitioner as a perpetrator because he and the Petitioner had "bad blood" and that he was "sorry he lied under oath." The victim affirmed that the Petitioner's conviction was based solely upon the victim's identifying the Petitioner. The coram nobis petition requested tolling of the statute of limitations because the Petitioner learned of the victim's recantation the previous month. The State responded that the victim's affidavit lacked sufficient indicia of trustworthiness to warrant coram nobis relief and that the Petitioner failed to be reasonably diligent in discovering the victim's "false testimony."

At the evidentiary hearing, James Williams testified that he contacted the Petitioner's family and, later, the Petitioner's coram nobis counsel. Mr. Williams said that he wanted to meet with counsel because his testimony was the basis for the Petitioner's conviction, although the Petitioner was "an innocent man." Mr. Williams said that he wanted to clear his conscience because being responsible an innocent person being in prison had been "eating" at him. He said that although he testified at the trial that the Petitioner was one of the men who shot him, he lied "out of spite" because he was "mad" about an incident that happened before the shooting in this case. He knew at the time of the trial that the Petitioner was not involved in the shooting. Mr. Williams said that since the Petitioner's trial, Mr. Williams was wrongfully convicted of a crime

and served his sentence in confinement and that during this time, he thought about the Petitioner's conviction.

Upon questioning by the coram nobis court, Mr. Williams testified that the Petitioner's coram nobis counsel explained to him that by recanting his trial testimony, he was "acknowledging aggravated perjury." Mr. Williams stated that, at his request, coram nobis counsel provided him with copies of the statutes related to aggravated perjury and the statute of limitations and advised him to speak with an attorney if Mr. Williams desired. When asked if Mr. Williams wanted to continue his testimony, he stated, "I mean, I was under the impression that [the] statute[] of limitations was up." Mr. Williams agreed that counsel did not provide legal advice about whether the statute of limitations had expired for aggravated perjury and that counsel only provided copies of the statutory provisions. Mr. Williams stated that he wanted to proceed, although he had not consulted an attorney.

Mr. Williams testified that his motivation for his testimony related to his "bad karma" and that he recanted his trial testimony that the Petitioner was involved in the shooting. He denied telling anyone he lied before contacting coram nobis counsel.

Upon further questioning by the coram nobis court, Mr. Williams testified that in 2010, he was involved "in an undercover drug operation where [he] was set up and . . . sent to prison." Mr. Williams admitted he sold cocaine.

On cross-examination, Mr. Williams testified he served four years of a ten-year sentence before receiving parole in June 2014. He denied that he and the Petitioner were confined in the same correctional facility and said that he saw but did not speak to codefendant Harris when he attended a court hearing. He initially said that he began to feel guilty when the Petitioner was convicted and sent to prison. However, Mr. Williams said, "It just took me being locked up and somebody pointing me out and I was like, I see how [the Petitioner] feel[s]." Mr. Williams admitted his guilt relative to his 2010 drug conviction and agreed the State's witnesses gave truthful testimony against him. He clarified that he had been upset about the Petitioner's confinement since the Petitioner went to prison. Mr. Williams stated that he had known the Petitioner a long time, that they had been friends, and that they began having "problems" because the Petitioner thought Mr. Williams shot the Petitioner's older brother in 2005.

Mr. Williams testified that codefendant Harris was one of the shooters but that he was "not at liberty" to identify the second person because Mr. Williams had previously shot the second person. Mr. Williams said that he had "since made peace" with the second shooter. The coram nobis judge interjected and stated that Mr. Williams's refusal to identify the second shooter was "just going to hurt" the Petitioner. The judge asked if Mr. Williams wanted to help the Petitioner, and Mr. Williams stated that the Petitioner did not shoot him.

Mr. Williams testified that he first contacted the Petitioner's younger brother before contacting coram nobis counsel. Mr. Williams stated that before he was released from prison, his uncle attended a large annual neighborhood cookout, that the Petitioner's younger brother attended the cookout, and that the Petitioner's younger brother and Mr. Williams's uncle discussed Mr. Williams and the Petitioner. Mr. Williams explained that although he never told anyone he had lied at the Petitioner's trial, everyone in the neighborhood knew the Petitioner was not in the car on the night Mr. Williams was shot. Mr. Williams said that after his release from prison, which was about one month after the neighborhood cookout, Mr. Williams's uncle told him that the Petitioner's younger brother wanted to talk and asked if Mr. Williams was willing to talk to the Petitioner's brother. Mr. Williams said that he agreed to talk to the Petitioner's brother and that Mr. Williams's uncle gave him the Petitioner's brother's telephone number.

The coram nobis court questioned Mr. Williams about the reason he waited until September 2017 to recant his previous identification of the Petitioner, and Mr. Williams said,

> [P]ride and where I was at in my life. But like I said, I was incarcerated and . . . getting closer to God and this has been eating me up and this is something I want to do, not because I seen somebody somewhere . . . I wanted to do what was right and that's why I . . . stand on what my decision is.

Mr. Williams testified that at the time of the shooting, he did not want to identify the perpetrators because he wanted to "handle them" personally but that he decided not to take matters into his own hands after his mother asked him to consider his children. Mr. Williams said that his trial testimony was true, except for his identification of the Petitioner. Mr. Williams said that he was mad at the Petitioner because Mr. Williams believed the Petitioner was connected to a shooting involving Mr. Williams's children and sister. Mr. Williams said that this shooting was the incident he previously stated he was not at liberty to discuss and that "all [was] forgiven." He said his identification of the Petitioner was the result of Mr. Williams's spite toward the Petitioner. Mr. Williams agreed that the prosecutors did not coerce him to testify and only wanted him to be truthful. He said that only codefendant Harris, not the Petitioner, threatened to kill him when the case was pending before the trial.

Mr. Williams testified that at the time of the Petitioner's trial he had previous convictions for aggravated burglary, two counts of aggravated assault, attempt to commit aggravated robbery, altering a serial number, two counts of unlawful possession of a weapon, and tampering with evidence. He said that his drug-related conviction occurred after the Petitioner's trial. He denied receiving a telephone call from the Petitioner's mother before the coram nobis hearing began but said the Petitioner's older brother called him to "make sure" Mr. Williams would be at the hearing. Mr. Williams denied

- 9 -

receiving anything of value in exchange for his hearing testimony and said that the Petitioner did not shoot him.

The coram nobis court denied relief after discrediting Mr. Williams's testimony. The court determined that the Petitioner was reasonably diligent in discovering Mr. Williams's recantation and that the jury might have reached a different conclusion had it heard the recantation. The court, though, was not "reasonably well satisfied" that Mr. Williams's recantation was truthful. The court noted that Mr. Williams "came forward" only after being contacted by the Petitioner's family. The court stated that it was "concerned" about Mr. Williams's testimony relative to "when he realized he was wrong to have testified falsely." The court found that although Mr. Williams testified he was "eaten up" by his false testimony when the Petitioner was convicted, Mr. Williams requested the Petitioner receive the maximum sentence of twenty-years at sentencing. The court was also concerned that Mr. Williams testified that he realized his false testimony was wrong when he was convicted of the drug-related offense in 2010 and sentenced to ten years' confinement, but he waited seven additional years and until the Petitioner's family contacted him to recant his trial testimony. The court found that Mr. Williams never admitted to anyone that he had lied at the trial and "note[d] with suspicion" that Mr. Williams appeared concerned about the statute of limitations for aggravated perjury.

The coram nobis court found that "nothing surrounding the trial" showed Mr. Williams testified falsely at the trial. The court found that Mr. Williams was not pressured to testify against the Petitioner and that the Petitioner never threatened him. The court stated that although Mr. Williams was the only witness to identify the Petitioner, Mr. Williams's testimony relative to how the shooting occurred was corroborated by other witnesses. The court found that Mr. Williams's truthful testimony weighed against Mr. Williams's assertion that he lied at the trial about the Petitioner's identity. The court found that Mr. Williams's convictions for crimes of dishonesty also weighed against his credibility at the hearing.

The coram nobis court found that Mr. Williams's refusal to identify the person who shot him was critical to the court's credibility determination. The court determined that Mr. Williams's testimony that he "made peace" with the shooter was not believable. The court noted Williams's testimony that he initially wanted to exact vengeance on the shooters without involving the police and declined to accept that a person contemplating vengeance could "decide to ignore" the shooter's action and falsely implicate the Petitioner. This appeal followed.

The Petitioner contends that the coram nobis court erred by denying relief, arguing that the sole witness identifying him as one of the perpetrators recanted his trial testimony. The State responds that the petition was filed after the statute of limitations expired and, alternatively, that Mr. Williams's recantation was not reliable.

- 10 -

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for a writ of coram nobis must be filed within one year of the judgment becoming final in the trial court. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010). "[T]he statute of limitations . . . is not an affirmative defense that must be specifically raised by the State in error coram nobis cases; instead, the . . . petition must show on its face that it is timely filed." *Nunley v. State*, 552 S.W.3d 800, 829 (Tenn. 2018). A limited exception to the statute of limitations exists when due process requires tolling. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 101). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

The record reflects that on January 10, 2012, the supreme court denied the Petitioner's application for permission to appeal this court's denial of appellate relief in the conviction proceedings. *See State v. Frederick Edward Braxton and Leonard Cardell Harris*, No. M2009-01735-SC-R11-CD (Tenn. Jan. 10, 2012) (order). The petition for coram nobis relief was filed on November 13, 2017, which was long after the statute of limitations expired. However, the petition requested equitable tolling of the limitations period because (1) the Petitioner learned in October 2017 that the State's primary witness, and victim of the shooting, had recanted his trial testimony identifying the Petitioner as a perpetrator, (2) the evidence was newly arising, (3) the evidence related to

- 11 -

the Petitioner's innocence, and (4) the evidence could not have been litigated at an earlier time. Attached to the petition was Mr. Williams's detailed affidavit in which he recanted his trial testimony relative to the Petitioner's identity of the shooter.

Recently, our supreme court determined that "compliance with the timely filing requirement . . . is an essential element of a coram nobis claim." *Nunley*, 552 S.W.3d at 828. However, a petitioner can request equitable tolling of the limitations period.

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims . . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

*Id*. at 829 (internal citation omitted). Likewise, "the coram nobis petition must be filed within a time period that 'does not exceed the reasonable opportunity afforded by due process.'" *Id*. at 830 (quoting *Sample v. State*, 82 S.W.3d 267, 275 (Tenn. 2002)); *see Workman*, 41 S.W.3d at 103.

The record reflects that the coram nobis court entered a written order after reviewing the allegations in the petition. The court determined, without reference to the statute of limitations, that an evidentiary hearing was necessary in order for the court to receive testimony from Mr. Williams. We conclude that the court granted the Petitioner's request for equitable tolling of the limitations period because the petition stated with particularity that the ground for relief was later arising and that strict application of the limitations period would have effectively denied the Petitioner a reasonable opportunity to present his claim that the only witness to identify him as a shooter had recanted his trial testimony. Likewise, Mr. Williams's affidavit was executed on October 26, 2017, and the petition for relief was filed on November 13. As a result, the petition was filed within a reasonable time after obtaining the newly discovered evidence. *See Mixon*, 983 S.W.2d at 672 (determining that the coram nobis court erred by determining "as a matter of law that recanted testimony does not constitute newly discovered evidence"). The coram nobis did not err by holding an evidentiary hearing.

In any event, we conclude that the coram nobis court did not abuse its discretion by denying relief. A coram nobis court should grant relief upon the basis of newly discovered recanted testimony

- 12 -

only if (1) the . . . court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crm. App. 2001); *See Mixon*, 983 S.W.2d at 672-67 n.17.

The coram nobis court found that the Petitioner had established that he was reasonably diligent in discovering Mr. Williams's recantation and that the jury might have reached a different conclusion had the recanted testimony been presented at the trial. On October 26, 2017, Mr. Williams signed the affidavit, recanting his identification of the Petitioner as a perpetrator of the shooting, and the Petitioner filed his petition for relief based upon the recantation on November 17, 2017. Likewise, Mr. Williams was the only witness to identify the Petitioner as a perpetrator of a shooting. The record supports the court's determinations.

The coram nobis court, though, was not reasonably well satisfied that Mr. Williams's trial testimony was false and that the new testimony was true. In determining whether to grant coram nobis relief based upon recanted testimony, the court "must determine the credibility of the witnesses," and "[i]f the trial court does not believe that the witnesses presented by the accused are credible, the court should deny [relief]." *Hart*, 911 S.W.2d at 375. The court observed and heard Mr. Williams's testimony and was in the best position to determine his credibility, and "[t]he assessment of witness credibility is entrusted to the sound discretion of the [coram nobis] court." *Johnson v. State*, 370 S.W.3d 694, 700 (Tenn. Crim. App. 2011). Mr. Williams provided inconsistent testimony regarding his motive for recanting his trial testimony. Although Mr. Williams testified that he was "eaten up" when the Petitioner was convicted in 2008, Mr. Williams requested the maximum punishment at the sentencing hearing. Mr. Williams also testified that he began to feel guilty about his trial testimony when Mr. Williams was convicted in 2010 of a drug-related offense and ordered to serve his sentence in confinement. Mr. Williams's conviction occurred approximately two years after the Petitioner's trial, and Mr. Williams did not recant his testimony until 2017. Likewise, Mr. Williams was concerned about the statute of limitations for aggravated perjury and refused to identify the second perpetrator. Mr. Williams stated he had "made peace" with the person involved in the shooting, although Mr. Williams's initial reaction was to exact vengeance upon the people who shot him without involving the police. Mr. Williams admitted that the prosecutors did not pressure or coerce him to testify against the Petitioner and only wanted him to be truthful. The court's credibility determination was supported by the record and was not an abuse of discretion. *See Johnson*, 370 S.W.3d at 700. As a result, we conclude that the coram nobis court did not err by denying relief.

Based upon the forgoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE